UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLENE P., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | No. 21 CV 3794 <br><br> Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Plaintiff Charlene P.[1] appeals the Social Security Commissioner's denial of her applications for disability insurance benefits and supplemental security income. Because substantial evidence supports the administrative law judge's decision, I affirm.

I. **Legal Standards**

Judicial review of social security decisions is limited: I must affirm if the ALJ applied the law correctly and supported her decision with substantial evidence. *Mandrell v. Kijakazi*, 25 F.4th 514, 515 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).[2] Substantial evidence isn't a high bar, *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), and means "such relevant evidence as a reasonable mind

---

[1] I refer to plaintiff by her first name and the first initial of her last name to comply with Internal Operating Procedure 22.

[2] The ALJ's decision became final under the Social Security Act when the Appeals Council declined review. *See* 42 U.S.C. § 405(g); *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021) (citations omitted).

might accept as adequate to support a conclusion." *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## II. Background

Charlene P. suffered from obesity, carpal tunnel syndrome, degenerative disc disease, inflammation in her hip or piriformis syndrome, depression, bipolar disorder, post-traumatic stress disorder, and obsessive compulsive disorder. R. 103–04.[3] Medical records showed that plaintiff also had a groin strain, substance abuse problems, ovarian cyst and uterine fibroids, hypertension, anemia, and a possible transient ischemic attack, and Charlene P. said that she had degenerative joint disease in her shoulder and hip, knee problems, dystonia, and Parkinson's disease. R. 104.

Plaintiff filed applications for disability insurance benefits and supplemental security income. R. 101. The Social Security Administration denied her applications initially and on reconsideration. R. 56, 67, 82, 95, 101. Charlene P. appealed the denial to an ALJ, and plaintiff and a vocational expert testified at a hearing held by telephone in December 2020. R. 12–45, 101, 148–59. The ALJ denied the claim, finding that Charlene P. wasn't disabled during the period in question. R. 101–11.

To decide whether Charlene P was disabled, the ALJ used the agency's five-step process. R. 102–11. The five steps ask: 1) whether the claimant is currently

---

[3] The administrative record, cited as R., can be found at [8-1]; [8-2]; [8-3]; [8-4]; [8-5]; [8-6]; [8-7] and [8-8]. Bracketed numbers refer to entries on the district court docket. Other than in citations to the administrative record (which use page numbers from the bottom of the record), referenced page numbers are taken from the CM/ECF header placed at the top of filings.

employed; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; 4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and 5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520.[4]

At step one, the ALJ found that Charlene P. was not gainfully employed. R. 103. At step two, the ALJ found that plaintiff had seven severe impairments: obesity, carpal tunnel syndrome, mild cervical degenerative disc disease, trochanteric bursitis or piriformis syndrome, major depressive disorder versus bipolar disorder, post-traumatic stress disorder, and obsessive compulsive disorder. R. 104. The ALJ found that Charlene P.'s other impairments weren't severe because plaintiff's substance abuse problem was in remission, Charlene P. had fully recovered from a possible ischemic attack, and plaintiff received limited and conservative treatment for a groin strain, ovarian cyst and fibroid uterus, hypertension, and iron deficient anemia. R. 104. The ALJ found that Charlene P.'s reported hip and shoulder disease, knee disorder, dystonia, and Parkinson's disease weren't medically determinable impairments because radiology reports on plaintiff's hip, shoulder, and knees were normal, a doctor's reference to Parkinson's disease appeared to be in error, and plaintiff hadn't been diagnosed with these problems. R. 104.

---

[4] If the agency cannot determine disability at a step, it goes on to the next step. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proving disability at steps one through four; the burden of proof shifts to the Commissioner at step five. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (citation omitted).

3

At step three, the ALJ decided that Charlene P.'s impairments didn't meet or medically equal the severity of one of the agency's listed impairments. R. 104–06. So the ALJ assessed plaintiff's residual functional capacity in order to complete steps four and five of the analysis. R. 106–11. A person's RFC represents her capacity to perform physical and mental activity in a work setting—eight hours a day, five days a week—despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment considers all of the evidence (medical and non-medical) and all of a claimant's limitations. 20 C.F.R. § 404.1545(a).

The ALJ began her RFC analysis with Charlene P.'s symptoms. R. 107. Plaintiff said that she was unsteady on her feet, tingling and numbness in her hands and neck made it hard for her to grasp objects and dress, she could lift objects weighing only two or three pounds, couldn't lift her arms, and used a walker to get around. R. 27–34, 37. As for her mental problems, Charlene P. testified that her thoughts raced, she had insomnia and panic attacks, and that to treat these symptoms she took medication and received mental health treatment over the phone. R. 34–38. Charlene P. said that her problems prevented her from working, but the ALJ rejected that claim, having found that plaintiff's symptoms weren't as intense, persistent, or limiting as Charlene P. alleged. R. 107.

The ALJ found that Charlene P.'s inconsistent and sporadic history of earnings—there were gaps in many annual earnings reports from 1988–2009 and possible incomplete records in 2005 and 2011—suggested that plaintiff's lack of work history might not be the result of her impairments. R. 107, 207. The ALJ also

4

discounted Charlene P.'s alleged symptoms because plaintiff said that she cared for a dog, shopped in stores occasionally, and attended family gatherings. R. 107, 222, 224–25. The ALJ found that a report from Charlene P.'s friend largely repeated plaintiff's complaints. R. 107, 236–44.

Plaintiff's medical records included normal radiology reports on Charlene P.'s wrists from June 2019. R. 482, 485. Plaintiff was also negative on two tests for carpal tunnel during physical exams in August and October 2019, and one exam showed that she had full range of motion in her wrists. R. 409, 554. Charlene P. had x-ray imaging taken of her cervical spine in August 2020, but the results were normal. R. 1560.

A physical examination from October 2020 showed that Charlene P.'s reflexes were symmetric and that she was sensitive to light touches on both of her arms, range of motion in plaintiff's cervical spine was slightly limited, and plaintiff had full strength in her arms. R. 853–54. The same exam showed that plaintiff was weakly positive on a test for nerve compression and positive on a test used to diagnose carpal tunnel. R. 853–54. Charlene P. sought help for numbness in her left side, pain in her hands, and decreased strength, but a neurological exam showed normal strength, sensation, reflexes, coordination, and gait. R. 1587. An MRI of plaintiff's head, taken in November 2020, was unremarkable. R. 1632–33. An MRI of her cervical spine taken at the same time showed mild degenerative changes which were normal for her age. R. 1627–30. Electromyography results submitted after the hearing were abnormal, and showed evidence of bilateral median sensory neuropathy at the wrist,

consistent with mild carpal tunnel syndrome. R. 108, 1649. A doctor reviewing the results recommended that Charlene P. wear braces at night. R. 1649.

Plaintiff sought emergency room care for hip pain in May 2018. R. 307. Charlene P.'s hip was tender, but imaging showed no fracture, she had normal range of motion, coordination, and reflexes, and she was prescribed a cane and told to apply cold compresses and rest the area. R. 309–10. Plaintiff didn't have trouble walking during four subsequent physical examinations. R. 49, 408, 447, 853. Charlene P. continued to have hip pain and was diagnosed with piriformis syndrome in January 2020. R. 633–34. Plaintiff's doctor referred her to physical therapy, R. 634, but records showed that she was unable to attend therapy because of the pandemic. R. 852. Charlene P.'s BMI indicated that she was obese. R. 856, 1266.

Plaintiff sought treatment for bipolar disorder, opioid dependence, post-traumatic stress disorder, obsessive-compulsive disorder, and depression. *See* R. 559–60. While records showed that Charlene P. didn't seek emergency room care and wasn't hospitalized for her mental health conditions, she was prescribed medication for her depression and bipolar disorder. R. 559–60. Plaintiff's mood was often down during examinations, but records also showed that she was oriented to her surroundings and that her insight, judgment, and thought processes were intact. *See* R. 397, 403, 559. A consultative psychological examination in November 2019 showed that Charlene P. had impaired long-term memory, inadequate judgment and basic computational skills, moderately obsessive ideas, and impaired insight into her own situation. R. 565. During that examination, plaintiff displayed only "modest effort."

6

R. 565. In subsequent examinations Charlene P. had normal mood and affect, logical thought processes, normal memory, and good judgment, but continued to report trouble with anxiety and depression, and reported sleeping problems and irritability. R. 584, 657, 853.

The state agency's medical consultants found that Charlene P.'s physical impairments weren't severe. R. 51, 62, 76, 89. The ALJ disagreed with their opinion because abnormal electromyography testing, received at the hearing, supported greater physical limitations, and because plaintiff's obesity combined with her right hip problems supported postural and environmental limitations. R. 109. The state agency psychological consultants found that plaintiff could perform simple, routine tasks. R. 54–55, 65–66, 93. The ALJ disagreed with that assessment too—and found greater mental limitations—because the consultants didn't account for Charlene P.'s moderate limitation in interacting with others, record of irritability and negativity, or for plaintiff's complaints of panic attacks. R. 109.

Dr. Kyle Geissler wrote that plaintiff's pain would prevent her from performing even simple tasks, that she could rarely lift or carry ten pounds, use her hands and fingers just a tenth of the day, and would require four or more absences from work each month. R. 823–30. The ALJ found this opinion unpersuasive because Dr. Geissler saw Charlene P. only once, Geissler's physical examination was largely normal, and because the opinion was inconsistent with plaintiff's conservative history of treatment, including recommendations for wrist braces. R. 109, 853–56.

7

Another of plaintiff's doctors—Joanna Curran—wrote that plaintiff could only rarely lift or carry ten pounds, would miss four days per month of work, use her hands and fingers just a quarter of the workday, and could use her arms just half the time. R. 833–40. Dr. Curran was also of the opinion that Charlene P.'s mental health conditions meant that she probably couldn't deal with normal stress, respond well to change, get along with coworkers, or complete work. R. 833–40. The ALJ found Dr. Curran's opinion unpersuasive because the physical limitations described weren't supported by Dr. Geissler's physical examination. R. 109–10. Because Dr. Curran wasn't a mental health specialist and plaintiff had no record of inpatient treatment or emergency room visits, the ALJ also discounted Dr. Curran's recommendations for mental health limitations. R. 110.

Based on this record, the ALJ concluded that plaintiff had the capacity to perform light work, was able to lift or carry twenty pounds occasionally and ten pounds frequently, and could stand, walk, or sit for six hours in a day. R. 106. The ALJ also found that Charlene P. could only occasionally take certain physical movements, and had limited ability to use her arms and perform tasks with her hands. R. 106. Finally, the ALJ found that plaintiff's RFC included some mental limitations: plaintiff could handle only simple, routine, and repetitive tasks, make only simple work-related decisions, couldn't handle fast-paced production line work, could occasionally tolerate incidental contact with the general public, and should not be made to work on joint or tandem tasks with coworkers. R. 106.

At step four, the ALJ compared Charlene P.'s RFC with the requirements of her past relevant work as a home attendant. R. 110. Citing a vocational expert's testimony, the ALJ found that plaintiff couldn't return to that previous work. R. 110. In the final step of the analysis, the ALJ concluded that Charlene P. could make a successful adjustment to other work. R. 110–11. The vocational expert testified that someone of plaintiff's age, education, experience, and abilities could perform work as an assembler or packager. R. 111. The ALJ concluded that Charlene P. was not disabled. R. 111.

Plaintiff asked the Social Security Appeals Council to review the ALJ's decision, but the Council denied that request. R. 1–3. The ALJ's decision became final after the Council denied review. R. 1–3. Charlene P. filed this suit, seeking judicial review of the agency's decision. [1].

### III. Analysis

An ALJ's role is to apply the right legal criteria, support her decision with substantial evidence, and build an accurate and logical bridge between the evidence and a conclusion. *See Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). The ALJ isn't required to mention every piece of evidence in the record to build the required bridge, but she must offer enough for the court to follow her reasoning. *See Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citations omitted); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Harmless error review applies to the ALJ's decision. *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).

9

Plaintiff objects to the ALJ's RFC finding. *See* [13] at 9–15. She argues that after rejecting all of the medical opinions in the record, the ALJ failed to adequately support her RFC determination with other medical evidence, substituting her own judgment for that of medical professionals. *See id*. Plaintiff also argues that the ALJ stepped out of line by assessing plaintiff's treatment as conservative, and by interpreting new evidence without medical scrutiny. *Id*. at 13–15.

The determination of a claimant's RFC isn't a medical opinion: it's a decision reserved to the Commissioner to be supported with medical and nonmedical evidence. *See* 20 C.F.R. §§ 404.1545, 404.1546(c), 404.1520c(a). An ALJ is required to evaluate every medical opinion she receives, considering such factors as the relationship between the claimant and the doctor, supportability, consistency, and specialization. *See* 20 C.F.R. §§ 404.1520c, 416.920c. But the ALJ is ultimately responsible for determining a claimant's RFC, and is permitted to reject opinion evidence from a claimant's doctors so long as she adequately supports an RFC determination with other evidence. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. § 404.1520c. An ALJ isn't permitted to play doctor, however, meaning that she cannot (1) substitute her judgment for that of medical professionals; (2) interpret new and potentially decisive medical evidence without medical input; or (3) make conclusions without any medical evidence in support. *See Deborah M.*, 994 F.3d at 790; *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009);

*McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).

In this case, the ALJ found the state agency psychological consultants to be somewhat persuasive, R. 105, but was unconvinced by the other opinions in the record. R. 109–10.[5] Plaintiff argues that the ALJ shouldn't have discredited Dr. Geissler's opinion on the basis of Charlene P.'s conservative treatment for wrist pain. [13] at 13–14. An ALJ is permitted to consider a claimant's course of treatment, however, *see Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) (citing 20 C.F.R. § 404.1529(c)(3)(v)), and the orthotics that Charlene P.'s doctors prescribed to treat her wrist problems were a conservative option. *See id.* (citing *Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir. 2000)).[6] The ALJ didn't just find Dr. Geissler's opinion unpersuasive on the basis of plaintiff's course of treatment, either: she also found that his assessment of plaintiff's limitations wasn't supported by the largely normal results from the physical examination that Dr. Geissler himself performed, and because Dr. Geissler had only seen Charlene P. one time. *See* R. 109, 853–56. The ALJ adequately explained how she weighed Dr. Geissler's opinion.

---

[5] The ALJ found that the state agency psychological consultants hadn't adequately accounted for the claimant's limitations in interacting with others, complaints of panic attacks, and record of irritability and negativity, and so found that plaintiff had greater mental limitations than the consultants had recommended. R. 109. On the basis of electromyography test results presented at the hearing and the combined effects of plaintiff's right hip disorder and obesity, the ALJ found that the state agency medical consultants hadn't imposed enough physical limitations on claimant, and so discounted their opinion—in plaintiff's favor. R. 109.

[6] Plaintiff relies on *Annette S. v. Saul*, Case No. 19 C 6518, 2021 WL 1946342, at *12 (N.D. Ill. May 14, 2021). The ALJ in that case overlooked a doctor's opinion that conservative treatment suggested a claimant needed more aggressive care, *see Annette S.*, 2021 WL 194634, at *12, but there's no similar doctor's opinion regarding Charlene P.'s course of treatment.

11

The ALJ's handling of Dr. Curran's mental health recommendations is more problematic. The ALJ found Dr. Curran's opinion unpersuasive for two reasons: Curran wasn't a mental health specialist and plaintiff had a conservative record of mental health treatment, with no inpatient treatment or related emergency room visits. R. 110. While the ALJ was permitted to consider course of treatment, *see Prill*, 23 F.4th at 749, hospitalization is a rare and extreme option for mental health problems, and someone may be unable to work because of those problems even if they don't require a visit to a hospital. *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015) (citations omitted). The ALJ was within the bounds of her discretion to discount Dr. Curran's opinion on the basis of her specialty. *See* 20 C.F.R. § 404.1520c(c)(4). But plaintiff's lack of hospitalization or ER visits related to her mental health problems weren't good reasons to discredit Dr. Curran's opinion, or to dismiss plaintiff's mental health symptoms. The ALJ had one good reason (medical specialty) and the other reason, while improper, was (as discussed below) harmless.

Having found the medical opinions in the record largely unpersuasive, the ALJ was required to ground her RFC determination in some other evidence. *See Schmidt*, 496 F.3d at 845; 20 C.F.R. § 404.1545(a)(3) (an ALJ must consider all of the relevant medical and nonmedical evidence and support a claimant's RFC using substantial evidence, not the ALJ's lay opinion). The ALJ did that here by crediting plaintiff's symptoms and examination results.[7]

---

[7] That the ALJ based her RFC determination on medical evidence distinguishes this case from those relied on by plaintiff. *See Keno B. v. Kijakazi*, No. 19 C 1593, 2021 WL 3290809,

12

The ALJ discussed a series of normal diagnostic and clinical findings including negative x-rays on plaintiff's wrists and cervical spine and physical examinations showing symmetric light touch sensitivity and reflexes, normal upper extremity and grip strength, and normal range of motion. R. 107. The ALJ found that Charlene P. had some physical limitations related to her carpal tunnel, however, noting plaintiff's consistent complaints of wrist and hand problems and test results submitted at the hearing showing neuropathy consist with mild carpal tunnel syndrome. R. 107–08.

Similarly, assessing plaintiff's hip problem, the ALJ took account of four physical examinations when Charlene P.'s gait was normal. R. 108. The ALJ noted that plaintiff had been prescribed a cane in May 2018, but found that that prescription had been specific to an emergency room visit when x-rays of Charlene P.'s hip were normal, and where plaintiff displayed normal range of motion, muscle tone, and coordination. R. 108. Acknowledging plaintiff's consistent reports of hip pain and decreased range of motion, the ALJ also took account of plaintiff's diagnosis of muscle spasms and referrals for physical and occupational therapy. R. 108. Based on this evidence—and records showing plaintiff's obesity—the ALJ found that Charlene P. had some related physical limitations: an inability to carry heavy weights frequently, limits on how much she could stand, walk, or sit, and restrictions on her ability to handle certain obstacles like ramps, stairs, ladders, and ropes. R. 106–08.

---

at *4 (N.D. Ill. Aug. 2, 2021); *Charles B. v. Saul*, Case No. 18 C 1377, 2019 WL 3557055, at *6 (N.D. Ill. Aug. 1, 2019); *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992).

13

The ALJ concluded that Charlene P. had some mental limitations in her RFC, finding that plaintiff was able to manage only simple, routine, and repetitive work tasks and decisions, couldn't perform fast-paced work, had limited capacity to interact with the general public, and couldn't work on joint or tandem projects with coworkers. R. 106. These limitations largely aligned with those of the state agency psychological consultants (whose opinion the ALJ found somewhat persuasive). R. 105, 53–55. The ALJ also chose to credit plaintiff's complaints of insomnia, panic attacks, and the record of irritability and negativity. R. 105, 109. Finally, the ALJ supported the mental limits in plaintiff's RFC by noting Charlene P.'s generally stable and normal presentation at mental health exams[8] and what the ALJ considered to be her conservative course of treatment. R. 108.

In discussing plaintiff's mental health problems, the ALJ mentioned Charlene P.'s lack of hospitalization or emergency room visits three times. R. 105, 108, 110. As noted above, the ALJ's assumptions about what constituted conservative mental health care were wrong. *See Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015). But any related error was harmless because the ALJ discredited Dr. Curran's opinion (and its stricter mental limits) for another reason, and based her assessment of plaintiff's mental health limitations on the opinion of the state agency psychological consultants, plaintiff's reported symptoms, and a series of mental status

---

[8] Bipolar disorder is episodic, which might make it unreasonable to rely too much on a claimant's behavior in any particular office visit. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). But the ALJ in this case considered Charlene P.'s mental status evaluations at several times as assessed by different medical providers, *see* R. 108–09, and didn't impermissibly rely on a snapshot of a single moment to assess plaintiff's overall condition. *Cf. Puzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citations omitted).

14

examinations showing that plaintiff was oriented, thinking clearly, and had intact judgment and insight. *See* R. 108–11; *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) (ALJ committed error by discounting a doctor's opinion based on a misreading of a record, but that error was harmless given other reasons the ALJ cited for discounting the opinion); *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citation omitted) ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

Plaintiff objects to the ALJ's interpretation of new evidence that wasn't submitted to medical scrutiny. *See* [13] at 13. When a claimant submits "new and potentially decisive medical evidence," an ALJ isn't allowed to interpret that evidence without medical input. *See McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (citing *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) and *Akin v. Berryhill*, 877 F.3d 314, 317–18 (7th Cir. 2018)); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (An ALJ erred by evaluating a report that "changed the picture" of a claimant's impairments, making previous assessments outdated.).

The ALJ received one additional record during the hearing, the results of an MRI of plaintiff's brain and cervical spine. R. 101, 1623–38. The examining doctor wrote that the results were normal showing "minimal microvascular changes and arthritis which are normal for [plaintiff's] age." R. 1626. The ALJ didn't submit these results to medical scrutiny, but they were consistent with earlier physical and a neurological examinations, and with an August 2020 cervical spine x-ray showing normal results. R. 107. Plaintiff's MRI results were new, but they weren't potentially

15

decisive, didn't change the picture of Charlene P.'s conditions, and the ALJ wasn't required to submit them to medical scrutiny. *See McHenry*, 911 F.3d at 871; *Stage*, 812 F.3d at 1125; *see also Kemplen v. Saul*, 844 Fed. App'x 883, 887 (7th Cir. 2021) (citations omitted) ("[N]ot all new evidence will necessitate a remand.").

Plaintiff submitted an additional record after the hearing: electromyography results that showed that she had neuropathy at the wrist consistent with mild carpal tunnel syndrome. R. 101, 1639–72. While the findings were abnormal, R. 1649, they were consistent with plaintiff's previous complaints of hand and wrist problems, and with an orthopedic consultation showing that Charlene P. was weakly positive on tests for carpal tunnel. *See* R. 107. The ALJ didn't ask any medical authority to review the electromyography results, and found that they did not support RFC limitations beyond those that she found for plaintiff's arm and hand problems. R. 108.

The ALJ also found that the electromyography results made the state agency medical consultants' less restrictive opinion about plaintiff's physical limitations unpersuasive. R. 109. Given that the electromyography results affected how the ALJ saw the state consultants' opinion, the better course would have been to submit the results to medical scrutiny, rather than assess their importance independently. *See McHenry*, 911 F.3d at 871; *Stage*, 812 F.3d at 1125. But the results were consistent with the record evidence of plaintiff's mild wrist problems, and the ALJ took account of them by imposing related limitations—in plaintiff's favor—beyond what the state

16

agency medical consultants had recommended. R. 109.[9] Plaintiff offers no argument on appeal that the electromyography results were potentially decisive on the question of disability, so there is no basis to find a harmful error in the handling of those records.

The ALJ made assumptions about what constituted conservative mental health care treatment and failed to submit plaintiff's electromyography records to medical scrutiny. But because the ALJ had another reason to discount Dr. Curran, the electromyography results are not now argued to be potentially decisive, and the ALJ adequately explained how the existing medical records—physical examinations, radiology results, and records of plaintiff's mental status—supported the ALJ's RFC findings, it is clear how the ALJ would resolve plaintiff's case again on remand and any errors are harmless. *See Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)); *see also Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); 20 C.F.R. § 404.1545(a)(3); *Whitehead v. Saul*, 841 Fed. App'x 976, 982–83 (7th Cir. 2020) (An ALJ adequately supported his RFC based on other evidence in the record despite rejecting the specific restrictions outlined in the reviewing doctors' opinions.). Substantial evidence supports the decision, and the ALJ built the required bridge to her conclusion.

---

[9] In contrast to the situation in *Keno B. v. Kijakazi*, No. 19 C 1593, 2021 WL 3290809, at *3–4 (N.D. Ill. Aug. 2 2021), the ALJ here explained why the medical records offered after the hearing were inconsistent with the state agency doctors' opinion.

## IV. Conclusion

Plaintiff's motion for summary judgment, [12], is denied. The Commissioner's motion, [16], is granted. The ALJ's decision is affirmed. Enter judgment and terminate case.

ENTER:

                                                Manish S. Shah
                                                United States District Judge

Date: June 30, 2022